UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CONSTANTINO NARDOLILLO,           :
          Plaintiff,              :
                                  :
      v.                          :     CA 09-603 S
                                  :
MICHAEL J. ASTRUE, Comm.          :
Social Security Administration,   :
          Defendant.              :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

     This matter is before the Court on the request of Plaintiff
Constantino Nardolillo ("Plaintiff") for judicial review of the
decision of the Commissioner of Social Security ("the
Commissioner"), denying Supplemental Security Income ("SSI")
benefits, under §§ 205(g) and 1631(c)(3) of the Social Security
Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act").
Plaintiff has filed a motion to reverse the decision of the
Commissioner. Defendant Michael J. Astrue ("Defendant") has filed
a motion for an order affirming the Commissioner's decision.

     This matter has been referred to me for preliminary review,
findings, and recommended disposition pursuant to 28 U.S.C. §
636(b)(1)(B). I find that the Commissioner's determination that
Plaintiff was no longer disabled as of June 28, 2005, is not
supported by substantial evidence in the record. Accordingly, for
the reasons set forth herein, I recommend that Plaintiff's Motion
for Judgement Reversing or Remanding the Decision of the

Commissioner (Docket ("Dkt.") #10) ("Motion to Reverse") be granted and that Defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #12) ("Motion to Affirm") be denied.

## Facts and Travel

Plaintiff was born in 1965 and was thirty-nine years old on June 28, 2005. (Record ("R.") at 26, 85, 95, 734)  He completed the tenth grade, (R. at 103, 735), subsequently obtained his GED, (R. at 778), and has past relevant work experience as a furniture mover, caster, and driver, (R. at 26, 133, 736, 749).

Plaintiff filed an application for SSI on May 10, 2004, alleging disability beginning April 4, 2004, due to an abscess/infection in his lower spine and hepatitis C.  (R. at 19, 85-89, 95, 98-99)  His application was denied initially and on reconsideration, (R. at 19, 29, 31, 75-77, 81-84), and a request for a hearing before an administrative law judge ("ALJ") was timely filed, (R. at 19, 74).  A hearing was conducted on March 11, 2008, at the Adult Correctional Institutions ("ACI"), where Plaintiff was then incarcerated.  (R. at 19, 725, 728)  Plaintiff, appearing *pro se*, testified, as did an impartial vocational expert ("VE").  (R. at 19, 19 n.1, 728, 734-56)  A supplemental hearing was held on January 29, 2009, at which Plaintiff, represented by counsel, appeared and testified again.  (R. at 19, 19 n.1, 757, 773-86)  An impartial medical expert ("ME") also testified at the January 29th

hearing.  (R. at 19, 760-72, 787-88)[1]  In a decision dated February 25, 2009, the ALJ found that Plaintiff was disabled, as defined by the Act, from April 4, 2004, through June 27, 2005, but that he was no longer disabled as of June 28, 2005.  (R. at 24, 25-27) Plaintiff requested review by the Appeals Council, (R. at 13-14), which on October 19, 2009, denied his request, (R. at 7), thereby rendering the ALJ's decision the final decision of the Commissioner, (id.).  Thereafter, Plaintiff filed this action for judicial review.

## Issue

The issue for determination is whether substantial evidence in the record supports the decision of the Commissioner that Plaintiff was no longer disabled within the meaning of the Act as of June 28, 2005.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Although questions of law are reviewed de novo, the Commissioner's findings of fact, if supported by substantial evidence in the record,[2] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The

_____

[1] A vocational expert ("VE") was present at the second hearing, (Record ("R.") at 757, 759), but did not testify, (R. at 758, 789-90).

[2] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated

determination of substantiality is based upon an evaluation of the record as a whole. Id. at 30 (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1999)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)). The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420 (1971))).

**Law**

An individual is eligible to receive SSI if he is aged, blind, or disabled and meets certain income requirements. See 42 U.S.C. § 1382(a). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C.

---

Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Suranie v. Sullivan, 787 F. Supp. 287, 289 (D.R.I. 1992).

423(d)(1)(A).  A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a) (2010).

The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled.  See 20 C.F.R. § 416.920(a) (2010); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  The evaluation may be terminated at any step. See Seavey, 276 F.3d at 5.  "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

## Medical Improvement

There is a statutory requirement that, if a claimant is entitled to disability benefits, his continued entitlement to such benefits be reviewed periodically.  20 C.F.R. § 416.994(a) (2010);

see also (R. at 21)("If the claimant is found disabled at any point in the process, the [ALJ] must also determine if his disability continues through the date of the decision."). Termination of benefits is governed by 42 U.S.C. § 423(f). Cogswell v. Barnhart, No. Civ. 04-171-P-S, 2005 WL 767171, at *1 (D. Me. Mar. 14, 2005).

> 42 U.S.C. § 423(f) provides in relevant part that benefits may be discontinued only if (1) there is substantial evidence to support a finding of medical improvement related to an individual's ability to work and (2) the individual is now able to engage in substantial gainful activity. See also 20 C.F.R. § 404.1594(a).[3] Medical improvement is defined as "any decrease in the medical severity" of an impairment, and any such decrease "must be based on changes in the symptoms, signs and/or laboratory findings" associated with the claimant's impairment. Rice v. Chater, 86 F.3d 1, 2 (1st Cir. 1996)(citations and internal quotation marks omitted ; see also 20 C.F.R. § 404.1594(b)(1). "To find medical improvement, the Commissioner must compare the prior and current medical evidence to determine whether there have been any such changes in the signs, symptoms and laboratory findings associated with the claimant's impairment." Rice, 86 F.3d at 2; see also 20 C.F.R. § 404.1594(c)(1). ...

Santiago v. Barnhart, 386 F. Supp. 2d 20, 23 (1st Cir. 2005); see also Cogswell, 2005 WL 767171, at *1 (same).

> Medical improvement is related to [a claimant's] ability to work if there has been a decrease in the severity, as defined in paragraph (b)(1) of this section, of the impairment(s) present at the time of the most recent

---

[3] The Commissioner has promulgated similar regulations for evaluating medical improvement in Disability Insurance Benefits ("DIB") and SSI cases. See 20 C.F.R. § 404.1594 (2010) (describing medical improvement standard for DIB); 20 C.F.R. § 416.994 (2010) (describing medical improvement standard for SSI).

favorable medical decision[4] and an increase in [the claimant's] functional capacity to do basic work activities as discussed in paragraph (b)(4) of this section.

20 C.F.R. § 416.994(b)(1)(iii). On the other hand:

Medical improvement is not related to [a claimant's] ability to work if there has been a decrease in the severity of the impairment(s) as defined in paragraph (b)(1)(I) of this section, present at the time of the most recent favorable medical decision, but no increase in [a claimant's] functional capacity to do basic work activities as defined in paragraph (b)(1)(v) of this section.

20 C.F.R. § 416.994(b)(1)(ii); see also 20 C.F.R. § 416.994(b)(1)(iii) ("A determination that medical improvement related to [a claimant's] ability to work has occurred does not, necessarily, mean that [the claimant's] disability will be found to have ended unless it is also shown that [the claimant is] currently able to engage in substantial gainful activity as discussed in paragraph (b)(1)(v) of this section."). Any determination made under 42 U.S.C. § 423(f) is to be made "on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. § 423(f).

---

[4] The most recent favorable medical decision is the latest decision involving a consideration of the medical evidence and the issue of whether the claimant was disabled or continued to be disabled which became final. See 20 C.F.R. § 416.994(b)(1)(vii). In the instant case, there is only one decision. (R. at 19-28)

# ALJ's Decision

Following the familiar sequential analysis, see 20 C.F.R. §
416.920(b)-(g), and the steps outlined in 20 C.F.R. §
416.994(b)(5)(I)-(vii), the ALJ in the instant case made the
following findings: that Plaintiff had not engaged in substantial
gainful activity from April 4, 2004, through June 27, 2005, (R. at
22); that at all times relevant to the ALJ's decision, Plaintiff's
L1-2 disc disease with wedge compression fracture, status post
epidural abscess with osteomyelitis[5] constituted a severe
impairment, (id.); that from April 4, 2004, through June 27, 2005,
the severity of Plaintiff's L1-2 disc disease equaled in severity
the criteria of § 1.04 of 20 C.F.R. Part 404, Subpart P, Appendix
1, (R. at 23); that Plaintiff was under a disability, as defined by
the Act, from April 4, 2004, through June 27, 2005, (R. at 24);
that medical improvement occurred as of June 28, 2005, (R. at 25);
that beginning on June 28, 2005, the claimant had no impairment or
combination of impairments which met or medically equaled in
severity one of the impairments listed in 20 C.F.R. Part 404,
Subpart P, Appendix 1, (id.); that the medical improvement which
had occurred was related to Plaintiff's ability to work because he
no longer had an impairment or combination of impairments which met

---

[5] Osteomyelitis is "an infectious inflammatory disease of bone that
is often of bacterial origin and is marked by local death and separation
of tissue[.]" Merriam Webster's Medical Desk Dictionary ("Merriam
Webster's") 571 (1996).

or medically equaled a listing, (id.); that beginning on June 28, 2005, Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except for a need to alternate sitting and standing at will, (id.); that although Plaintiff's statements concerning the limiting effects of his symptoms were generally credible for the period from April 4, 2005, through June 27, 2005, his statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible for the period beginning on June 28, 2005, to the extent they conflicted with the above RFC, (R. at 24, 26); that beginning on June 28, 2005, Plaintiff was unable to perform his past relevant work, (R. at 26); that beginning on June 28, 2005, considering Plaintiff's age, education, work experience, and RFC, Plaintiff was able to perform a significant number of jobs in the national economy, (R. at 27); and that Plaintiff's disability ended on June 28, 2005, (id.).

**Errors Claimed**

Plaintiff alleges that: 1) the ALJ's decision finding medical improvement as of June 28, 2005, is not supported by substantial evidence of a decrease in medical severity based upon changes in the symptoms, signs and/or laboratory findings associated with Plaintiff's impairment as defined in 20 C.F.R. § 416.994(b)(1)(i); 2) the ALJ's decision relies upon factual misstatements concerning both the medical record and the ME's testimony as justification for finding that Plaintiff had experienced medical improvement and was

no longer disabled; 3) the ALJ's rejection of Plaintiff's testimony concerning the intensity, persistence, and limiting effects of his symptoms as not credible beginning on June 28, 2005, was erroneous in light of the objective medical evidence and the ME's testimony; and 4) it was reversible error for the ALJ not to find that Plaintiff had a continuing disability after June 27, 2005, as he had experienced no medical improvement.

## Discussion

### I. Medical Improvement

The ALJ found that as of June 28, 2005, "medical improvement occurred that is related to [Plaintiff]'s ability to work, and [Plaintiff] has been able to perform substantial gainful activity from that date through the date of this decision. Thus, [Plaintiff]'s disability ended on June 28, 2005." (R. at 19); see also (R. at 25-27). Plaintiff challenges the ALJ's finding of medical improvement as of June 28, 2005, on numerous grounds. See Memorandum of Law in Support of Plaintiff's Motion for Judgment Reversing or Remanding the Decision of the Commissioner ("Plaintiff's Mem.") at 13-19. After close review of the record, the Court concludes that the ALJ's finding of medical improvement is unsupported by substantial evidence.

In reaching the conclusion that Plaintiff's back impairment had improved such that he was no longer disabled as of June 28, 2005, the ALJ relied in large part on the opinion of Louis A.

Fuchs, M.D., the ME, which the ALJ accorded "significant probative value as he is a [b]oard-certified orthopedic surgeon and, uniquely in this record, had the opportunity to examine the entire longitudinal medical record." (R. at 24) The ALJ further reasoned that:

> Dr. Fuchs' testimony is bolstered by the claimant's discharge information on June 27, 2005, which reflected that he had no localizing process, neurologic compromise or underlying infections; and by his November 16, 2005, examination with University Medical Group, when he indicated that he felt good and was taking only the prescribed Vicodin for his pain. The claimant required no emergent treatment for his back and he has not sought any neurosurgical or other pain management services.

(Id.)(internal citations omitted). The ALJ also stated that "Dr. Fuchs confirmed that as of [June 28, 2005], the claimant no longer demonstrated any residual infection, and had no further evidence of bony deterioration, with a negative neurologic examination. He no longer required intensive treatment." (R. at 25); see also (id.)("[A]s of that date, the claimant did not require any intensive treatment services such as a neurosurgeon or pain management services, his examinations were negative for neurologic compromise or ongoing infection, and he was not under any specific restrictions.").

The ME summarized the medical record as follows:

> [W]hat the record shows is that [Plaintiff] was hospitalized at Rhode Island [H]ospital [o]n May 4th of '04 through June 21st of '04 as a result of an infection of his spine consisting of an epidural abscess, infectio[us] spondylitis, with the agent being

pseudomonas.[6]  Significant illness, radiologic studies
on June 15th, 2004[,] showed worsening of the condition
when compared to an earlier study of May of '04, he was
discharged under treatment and a neurosurgical exam
performed on October 22nd, 2004[,] showed his upper
extremities were quite satisfactory, his lower
extremities in a lot of pain, but motor strengths were
good and sensations were intact and surgical
stabilization was recommended.  In a physical exam dated
March 21st, 2005, his back was found to be tender but
neurologically he was decent, his g[ait] was found to be
satisfactory ... and reflexes were symmetrical.  He was
hospitalized at Roger Williams [H]ospital from June 19th
of '05 through June 23rd of '05 with a fever of unknown
etiology.  He responded nicely with antibiotics and a
neurological examination at that time was satisfactory.
And he was hospitalized then at Roger Williams again from
June 27 through 29th with low back pain and the
examination again was satisfactory neurologically
speaking.  And finally on July 28th of '08 he had a
psychological evaluation and found to be depende[nt] on
opiates and poly substance abuse.  So [Plaintiff] in
summary has had a significant insult to his back with an
infection but neurologically the exams of the lower
extremities have been decent and I think he is, he
doesn't meet but he certainly would be limited in his
physical abilities.  And it should be commented that
there was nothing to review as far as a good orthopedic
or neurological examination after June of '05, unless I'm
missing something.[7]

---

[6] Pseudomonas are described as "short rod-shaped motile gram-negative bacteria including some saprophytes, a few animal pathogens, and numerous important plant pathogens[.]"  <u>Merriam Webster's</u> 664.

[7] The ALJ described the above testimony as follows:

Dr. Fuchs, a board-certified orthopedist, testified after
review of the records and the claimant's testimony.  He
indicated that the claimant contracted a severe infection in
his spine, and causing severe pain.  The claimant underwent a
series of MRI's, which as of March, 2005, had stabilized, with
an MRI of June 8, 2005, demonstrating no change from prior
testing.  The infection caused a degenerative condition in the
disc which could cause the claimant's pain.  Dr. Fuchs
indicated that after June, 2005, there were no detailed
physical examinations.  The undersigned notes that an October,
2008, examination reflected negative straight leg raising and

(R. at 761-62)  Asked if Plaintiff's impairment equaled in severity a listed impairment for any period of time, the ME responded: "Oh, yes, I think for the, the [y]ear after the onset he couldn't do anything."  (R. at 763)  Questioned about the basis for choosing one year as the end point, the ME replied:

    A    From the nature of the illness and we do have an exam dated March 21st of '05, his back was tender but neurologically he was intact.  Well with that kind of medical problem, and that's really disabling, so generally speaking a year after the onset.

    Q    All right.

    A    And then as recently as October of '04 they're recommending surgery, a significant attack.

(R. at 763-64)  In response to an inquiry from the ALJ as to the level of work someone would be able to perform after the one-year recovery period, the ME stated: "Only sedentary tasks, given the opportunity to sit and stand at will."  (R. at 764)  The ME also agreed that Plaintiff had been prescribed significant analgesic medications over the entire period.  (Id.)

    What is lacking in the ME's testimony thus far is any discussion of medical improvement in Plaintiff's back condition. The ME chose the one-year end point because "generally speaking a year after the onset," (R. at 764), one would be expected to

---

no evidence of inflammatory changes.

(R. at 24)

recover from "that kind of medical problem," (id.), which he characterized as "really disabling," (id.).  Other than noting a July 28, 2008, psychological evaluation, (R. at 762), the ME made no mention of any medical evidence after June 29, 2005, the day Plaintiff's disability ended according to the ALJ's determination.

The ME's testimony when questioned by Plaintiff's counsel belies the ALJ's statement that Dr. Fuchs "confirmed" that Plaintiff "had no further evidence of bony deterioration ...." (R. at 25)

> Q    Dr. Fuchs, in your review of the record, did you have an opportunity to take a look at any diagnostic test results?
>
> A    Yes.
>
> ....
>
> Q    And if you could doctor, if you take a minute to look at that, just look at comment on the findings of this MRI examination[8] if you would?
>
> A    What this shows is that he lost the disc space between the first and second lumbar vertebrate and they think it's probably from the old infection, and there's no real difference from the one that was done 13 months earlier.
>
> Q    Is it significant that there's been a loss of disc space?
>
> A    Yes, that represents the pathologic process.

(R. at 765-76)  Counsel then asked the ME to evaluate a subsequent MRI done on May 30, 2006, at the Atwood Diagnostic

---

[8] The MRI was performed on June 8, 2005, at Roger Williams Medical Center ("RWMC").  (R. at 540, 765)

Center:

Q    Doctor, you've had a chance to review this?

A    Yes.

Q    Okay.  First of all, you would agree that this more
     recent MRI was compared to the prior MRI of
     10/5/04?

A    Yes.

Q    There, there are some findings in this test I'd
     like you to comment on if you could. ...

....

Q    And I quote, [irregularity] of the vertebral artery
     end plates would be consistent with residual
     changes from prior discitis and osteomyelitis, end
     quote.  Could you please tell me what that means
     and what the significance of that finding is?

A    What that is meaning to transmit is just that
     there's been destruction of the vertebral bodies
     [sic] anatomy as a result of the infection.

Q    Well, when, when compared to the, it sounds as
     though it's being compared to the prior study and
     that there has been further degeneration, is that a
     fair characterization?

A    Yes.

Q    Okay.  Can you tell the extent of the degeneration
     from the test result?

A    No.

Q    Is it significant that there's been further
     degeneration?

A    Well what it represents is that over that period of
     time there's been more change in the anatomy, yes.

Q    And can you state with some medical certainty as to
     what the causes of that further degeneration would

be?

A    That would most likely be the result of the earlier infection altering the mechanics of the spine.

Q    So it's fair that the earlier infection is gone but the way the claimant moves is different and it's causing further damage to his back?

A    It could be, yes.

Q    Well is, is there another plausible explanation other than mechanics?

A    Not really.

Q    Okay.

A    The infection has been controlled so then the mechanics have been altered so there's destruction of the anatomy.

Q    Is it, is it reasonable to assume that with now almost two additional years passing that there's been additional destruction in his back?

A    Yes.

Q    And, is that significant?

A    Could be, yes.

(R. at 768-70)  The ME testified that at the L1 level:

[T]he posterior or the back portion of the vertebral body has been changed in position so that it's entering a space of the spinal canal but not to a degree that it's impeding any of the spinal, spinal canal anatomy where the nerves are not being impaired by it.  It's not squeezing on any of the important structures.

(R. at 770)  The ME further testified that the "mild disc bulging and mild facet joint degenerative ... [a]rthropy[,] [w]ithout limiting central stenosis," (R. at 770-71), at the L2, L3 level "most likely represents physiologic aging for a gentleman of his

16

age," (R. at 771).  Plaintiff's counsel continued his

questioning:

> Q    Okay.  So, looking, looking at the impression from
> this May 30th, 2006$_{[,]}$ report ... I'll just read the
> first impression, and I quote, residual mild L1
> retrol[y]sthesis and L1, 2 kyphosis secondary to
> prior discitis and osteomyelitis, end quote.  That
> impression is consistent with the findings we
> reviewed just a couple of minutes ago?
>
> A    Yes, with the addition of one factor, the kyphosis
> which represents and in [sic] some what forward
> flex hunch back if you will, because the anatomy
> has been disturbed, destroyed.
>
> Q    Does kyphosis have any negative consequences?
>
> A    Not in a mild degree, no.  But again, it's an
> alteration of the normal anatomy so over time it
> may provide discomfort problems.
>
> Q    Is it fair to say that the claimant at this point has a
> degenerative condition?
>
> A    Yes.
>
> Q    Is it also fair to say that his condition is worse
> at least as of the date of this exam, 5/30/06, from
> his last MRI on October 5th, 2004?
>
> A    Yes.
>
> Q    Is it also true that based upon your testimony just
> a few moments ago that since this is degenerative
> in nature that he is worse now than he was in May
> of 2006?
>
> A    Could be.
>
> Q    We, we don't have a recent MRI to confirm that
> fact?
>
> A    That's correct.
>
> Q    In, in the record.  At least as of May of '06 this
> condition cause[s] pain?

A    Yes.

Q    Is it likely that it's causing pain?

A    Yes.

Q    Is it likely that it causes pain that at times could be severe?

A    Yes.

Q    And disabling?

A    Yes.

(R. at 771-72)  It is difficult to reconcile the foregoing testimony with the ALJ's statement that Dr. Fuchs "confirmed" that Plaintiff "had no further evidence of bony deterioration ...." (R. at 25)

Even if the quoted statement were true, at most it would confirm only that Plaintiff's condition had not worsened.  The law is clear, however, that "the regulations require actual physical improvement in claimant's impairment, not merely an improved prognosis."  Rice, 86 F.3d at 3 (rejecting Commissioner's argument that claimant's prognosis had improved since his condition did not continue to worsen); Santiago, 386 F. Supp. 2d at 22 (citing Rice, 86 F.3d at 3); Cogswell, 2005 WL 767171, at *1 (same).  The ALJ in the instant matter appears to have focused on whether Plaintiff's back impairment had stabilized, not on whether it had improved. See (R. at 24)("As of June, 2005, his condition stabilized and he was being monitored only."); see also (R. at 23)("The claimant's spinal MRIs stabilized by October, 2004 ...."); (R. at 24)(noting

that Plaintiff underwent a series of MRIs "which as of March, 2005, had stabilized ..."); (id.)("This condition gradually stabilized, with no change in his diagnostic scans after March, 2005."). The ME did not testify that Plaintiff's condition had actually improved.

The ALJ's other reasons for finding medical improvement are also flawed. Regarding the ALJ's statement that the ME's testimony was "bolstered by the claimant's discharge information on June 27, 2005, which reflected that he had no localizing process, neurologic compromise or underlying infections; and by his November 16, 2005, examination with University Medical Group, when he indicated that he felt good and was taking only the prescribed Vicodin for the pain," (R. at 24)(internal citation omitted), the Court notes that this evidence is from 2005, while the hearings were held in March, 2008, and January, 2009.

The first statement is taken from the discharge summary following Plaintiff's hospitalization at the Roger Williams Medical Center ("RWMC") from June 27-29, 2005, for back pain, following a fall at home which aggravated Plaintiff's chronic back pain and was not controlled with oral medications. (R. at 573) After noting Plaintiff's history of epidural abscess and two recent prior hospitalizations at RWMC for back pain and fever, Mark Bell, M.D., summarized Plaintiff's hospital course as follows:

> The patient was admitted to the medical floor with
> increasing back pain. He did have evidence of spasm in

his back. He was treated with intravenous Dilaudid as
well as oral antispasmodics. His pain has improved. He
still has significant discomfort, but he is ambulating
much better. He has had no localizing process, he has no
neurological compromise, no evidence of an underlying
infectious process. His pain is improved with pain
medications and antispasm medications. At this point he
is at a level where he can be discharged home on oral
medications.

The case was discussed at length with the patient as well
as his wife, who was also present. Again, the patient
still has pain, but it is better than it was on
admission. He does have significant spasm and
medications are helping with this.

(R. at 573-74) The passage quoted by the ALJ reflects improvement
from this specific incident, i.e., the fall, not his overall
chronic back condition.

The second statement, relating to a single visit by Plaintiff
to the University Medical Group ("UMG"), is referenced in the ALJ's
summary of the medical evidence post-June 29, 2005:

The claimant was seen by University Medical Group in the
clinic for medication refills in August and November,
2005, and reported in February, 2006, that he had been
changed to Methadone (although it was not clear by whom)
with good results. The claimant's record is then silent
except for a few scattered clinic visits through the
Rhode Island Department of Corrections. It appears that
the claimant was given some medication for chronic back
pain while there, and in December, 2007, he sustained a
lumbar strain treated with physical therapy, but the
claimant was eventually cleared to return to light
workouts in the gym. There is no evidence that the
claimant was not in the general inmate population or was
medically restricted from any particular activities. The
claimant was seen in the emergency room in August, 2007,
for chest pain, but a cardiac evaluation was negative and
he was prescribed Protonix for heartburn. Upon release
from jail ... [t]he claimant was ... maintained on his
Vicodin for chronic pain through the University Medical
Group and as of October, 2008, he had lumbar tenderness

> but negative straight leg raising, and no signs of any
> inflammatory changes.

(R. at 23-24)(internal citations omitted).  In fact, the record
reflects that Plaintiff was seen at the University Medical Group on
August 1, 2005, (R. at 383), November 16, 2005, (R. at 380, 382),
January 11, 2006, (R. at 376-77), February 8, 2006, (R. at 375),
March 6, 2006, (R. at 373), September 10, 2008, (R. at 700-01), and
October 8, 2008, (R. at 702-03), for back pain.  On August 1, 2005,
Plaintiff complained of daily pain, and he was referred to the RWMC
pain clinic.  (R. at 383)  On November 16th, it was noted that there
had been no change in his chronic back pain.  (Id.)  Plaintiff's
Vicodin was refilled, and he signed a pain management agreement at
that visit.  (Id.)  On January 11, 2006, Plaintiff's Vicodin was
refilled, and he was also given Percocet.  (R. at 376-77)  The
notes reflect the attending physician's observation that Plaintiff
"has been fully disabled due to his back problem which stems from
an epidural abscess [on] 4/04."  (R. at 376)  On February 8, 2006,
it was recorded that Plaintiff had recently been admitted to RWMC
for back pain.  (R. at 375)  He was discharged on Methadone.  (Id.)
On March 8th, Plaintiff's Methodone was discontinued due to
Plaintiff's concerns,[9] and he was put back on Vicodin.  (R. at 373)
Relafen was added, and he was given a prescription for a back
brace.  (Id.)  On September 10, 2008, Plaintiff rated his lower

---

[9] The reason for Plaintiff's concerns is illegible.  (R. at 373)

back pain as an 8 out of 10, and he complained of difficulty walking. (R. at 700) He was again prescribed Vicodin. (R. at 701) On October 8th, it was noted that Plaintiff's back pain was compromising his daily routines, and his Vicodin was refilled. (R. at 702-03)

The ALJ similarly minimizes the treatment notes from the Rhode Island Department of Corrections ("RIDOC"). The ALJ refers to "a few scattered clinic visits," (R. at 23), and "some medication for chronic back pain," (id.), while at the ACI. By the Court's count, Plaintiff was seen by the RIDOC nursing staff five times, (R. at 417, 422, 427), and RIDOC doctors twelve times, (R. at 419-21, 423, 425-26, 429, 473-74, 476-77), for back pain or related issues. Plaintiff also saw an orthopedic surgeon, a Dr. Barnard,[10] at least twice, (R. at 463, 470, 740), and received physical therapy, (R. at 426, 429, 465, 476, 741), during his time at the ACI. In addition, the RIDOC records reflect that Plaintiff was consistently prescribed Vicodin[11] and also took ibuprofen for his pain. (R. at 431, 435-44, 451, 467, 478) In September of 2007, glucosamine was added. (R. at 423, 440) Further, while the ALJ notes that Plaintiff was taken to the emergency room in August of 2007 for chest pain, (R. at 24), he neglects to mention that Plaintiff was

[10] Although difficult to read, the doctor's name appears to be spelled "Barnard." (R. at 417, 419-20, 427-28, 431-34, 462-64, 468, 470, 472, 740)

[11] According to UMG office notes, Plaintiff reported that Vicodin was prescribed throughout his incarceration. (R. at 700-01)

also transported to the emergency room on April 3, 2006, after falling in court when "his legs gave out ...." (R. at 692) The above-cited RIDOC records clearly reflect more than "a few scattered clinic visits" and "some medication for chronic back pain."[12]

The ALJ additionally stated that Plaintiff "required no emergent treatment for his back and he has not sought any neurosurgical or other pain management services." (R. at 24) At least the first part of this statement is untrue.[13] Prior to his incarceration, Plaintiff presented to the RWMC emergency room on January 23, 2006, complaining of severe back pain. (R. at 312) Plaintiff also stated that he could not walk at home due to the pain. (Id.) He was admitted to Dr. Bell's service for management of his chronic pain. (Id.) As noted previously, on April 3, 2006, Plaintiff was transported to the emergency room via ambulance after falling in court due to his legs giving out. (R. at 692) From December 12-14, 2007, Plaintiff was on medical observation and/or

----

[12] The RIDOC records also reflect that Plaintiff's bunk was changed from upper to lower, he received a new mattress, and he was given a back brace. (R. at 417, 429, 433-34, 437, 448) Plaintiff testified that his job was changed from kitchen work to washing a telephone and table due to his inability to tolerate the pain of working in the kitchen. (R. at 738, 741-42)

[13] Although Plaintiff was referred to the RWMC pain clinic, (R. at 383), there is no evidence in the record that he went. As noted, he was admitted to RWMC on one occasion for pain management. (R. at 692)

the hospital ward at the ACI due to back pain.[14]  (R. at 422, 425, 427)

Although the ALJ is not required to address every piece of evidence in the record, see Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)("[A]n ALJ is not required to discuss every piece of evidence submitted."); Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)(recognizing that "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence"); Rasmussen-Scholter v. Barnhart, No. Civ.A. 03-11889-DPW, 2004 WL 1932776, at *10 (D. Mass. Aug. 16, 2004)("[T]he ALJ need not directly address every piece of evidence in the administrative record.")(citing Rodriquez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1)(1st Cir. Sept. 11, 1990)(per curiam, table decision)("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.")), here the omissions are glaring.  The picture the ALJ paints of Plaintiff's back impairment after June of 2005 is at best incomplete and at worst inaccurate. Accordingly, the Court cannot find that the ALJ's determination that medical improvement had occurred as of June 28, 2005, (R. at 25), is supported by substantial evidence.  I therefore recommend that the matter be remanded for further administrative proceedings.

---

[14] Plaintiff testified that he had been in the "Intake Hospital," (R. at 730-40), which appears to be confirmed by the RIDOC records, (R. at 425).

## II. Credibility

The ALJ found that Plaintiff's back impairment could reasonably be expected to cause some symptoms of the type he alleged, but that his statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible beginning on June 28, 2005. (R. at 26) Plaintiff argues that the ALJ erroneously rejected Plaintiff's allegations of disabling symptoms after June 28, 2005, in light of the objective medical evidence and the ME's testimony. See Plaintiff's Mem. at 18.

An ALJ is required to investigate "all avenues presented that relate to subjective complaints ...." Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28 (1st Cir. 1986). In addition, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (S.S.A.). When assessing the credibility of an individual's statements, the ALJ must consider, in addition to the objective medical evidence, the following factors:

1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate and aggravate the

> symptoms;
> 4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; see also Avery, 797 F.2d at 29 (listing factors relevant to symptoms, such as pain, to be considered); 20 C.F.R. § 416.929(c)(3) (2010) (same). The ALJ's credibility finding is generally entitled to deference, especially when supported by specific findings. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)); see also Yongo v. INS, 355 F.3d 27, 32 (1st Cir. 2004)("[T]he ALJ, like any fact-finder who hears the witnesses, gets a lot of deference on credibility judgments."); Suarez v. Sec'y of Health & Human Servs., 740 F.2d 1 (1st Cir. 1984) (stating that ALJ is "empowered to make credibility determinations ..."); cf. Becker v. Sec'y of Health & Human Servs., 895 F.2d 34, 36 (1st Cir. 1990)("A reviewing court must treat the agency's factual conclusion with considerable respect ....").

Here, the ALJ stated that:

At the hearing the claimant testified that he suffered from severe lower back, neck[,] and arm pain on a daily basis, with difficulty climbing stairs, and requiring a cane for ambulation. The claimant testified that he has difficulty with concentration and focusing on print, and that he can sleep for only 1 hour at a time at night. He requires a nap and several hot baths daily. He testified at his original hearing that he had problems with sitting, standing[,] and walking, and arm and leg numbness. He reported swelling of the feet and back. He indicated he could lift 5 to 10 pounds and could sit for 45 minutes at a time and stand for 30 minutes.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some symptoms of the type alleged, but that the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible beginning on June 28, 2005, to the extent they are inconsistent with the residual functional capacity assessed herein for reasons explained below.

In terms of the claimant's alleged back impairment, as discussed above, as of June, 2005, the claimant was noted to be demonstrating negative straight leg raising, no localizing process, no neurologic compromise, and no signs of infections. Although the claimant was seen using a cane on one visit, there is no evidence that he was consistently using a cane, and this cane was apparently prescribed at the time of the claimant's original illness. Recent treatment notes do not reflect that the claimant reported significant lower extremity weakness, nor was any detected on examination.

(R. at 26)(internal citation omitted). The Court finds that the three reasons the ALJ gave for his credibility finding are not supported by substantial evidence. The Court has already addressed the ALJ's first reason for finding Plaintiff's allegations not entirely credible, namely Dr. Bell's discharge summary from RWMC dated June 29, 2005, see Discussion section I. supra at 19-20, and need not repeat that discussion here. The Court notes, however,

that more recent evidence in the record supports Plaintiff's alleged pain symptoms. In this regard Plaintiff contends that the ALJ was silent as to Dr. Fuchs' statement that Plaintiff's testimony at the second hearing was consistent with the findings in Plaintiff's MRI from May 30, 2006. See Plaintiff's Mem. at 18; (R. at 788). The ME confirmed that the cited MRI supported Plaintiff's allegations regarding his chronic back pain. (R. at 788) Dr. Fuchs also testified that it was likely that Plaintiff's condition caused pain which could be severe and disabling. (R. at 772) In addition, while Plaintiff was "noted to be demonstrating negative straight leg raising," (R. at 26), as of June 29, 2005, on at least one subsequent occasion a RIDOC physician reported positive straight leg rising. (R. at 425, 461)

The second reason why the ALJ found Plaintiff's statements to be not entirely credible was that Plaintiff was seen using a cane only at one visit and that his cane was apparently prescribed at the time of Plaintiff's acute disc infection. (R. at 26) The ALJ is correct in stating that the cane was prescribed right after his disc inflammation occurred as Plaintiff testified on January 29, 2009. (R. at 779) However, the ALJ's statement that Plaintiff was seen using the cane only once is incorrect. In fact, Plaintiff was seen several times with a cane or, on occasion, a wheelchair, after June 28, 2005, which is the time when the ALJ found him to be no longer disabled. (R. at 27)

The nursing contact notes from the RIDOC on December 13, 2007, document that Plaintiff had to be transported by a wheelchair. (R. at 427, 468) On the next day, Plaintiff was still dependent on a wheelchair or a cane because of numbness in his legs and his inability to walk for a short distance. (R. at 425, 427, 461, 468) The RIDOC physician's order form from December 14, 2007, explicitly authorized Plaintiff to use a wooden cane and a wheelchair. (R. at 442) On December 18, 2007, Plaintiff went to a specialist, Dr. Barnard, by wheelchair because he still complained about numbness, tingling, and weakness in his legs. (R. at 463) Plaintiff's physical therapist, Steve Grupp, noted on January 4, 2008, that Plaintiff was now ambulating with a cane. (R. at 465) A RIDOC physician reported on January 9, 2008, that Plaintiff was walking with a cane. (R. at 426, 469) After the end of his incarceration Plaintiff saw his general care provider, William Weber, M.D., from UMG on September 10, 2008. (R. at 700-01) Dr. Weber stated that Plaintiff complained of lower lumbar back pain and difficulties ambulating and that Plaintiff used a cane. (R. at 700) Plaintiff testified that the cane took pressure off while walking, supported him when his legs felt weak, and helped him to pull himself up. (R. at 779)

Third, the ALJ discounted Plaintiff's statements as being not fully credible because neither recent treatment notes nor

examinations reflected any significant lower extremity weakness.[15]
(R. at 26)  The record documents two major episodes after June 28,
2005, when Plaintiff suffered from weakness in his legs.  First,
Plaintiff stated at an emergency room visit at RWMC on April 3,
2006, that "while in court, his legs gave out and he fell."  (R. at
692)  Second, from December 12-14, 2007, Plaintiff was under
medical observation in RIDOC's Intake Hospital because of his lower
back pain.  (R. at 422, 425, 427, 460-61, 468)  As noted
previously, at this time he had to be transported by wheelchair.
(R. at 425, 427, 461, 468)  A RIDOC physician reported on December
14, 2007, that Plaintiff had increasing numbness in front of both
legs, "weakness in [his] quads", and positive straight leg rising.
(R. at 425, 461)  The RIDOC nursing contact notes from the same day
state that Plaintiff was unable to walk even a short distance.  (R.
at 427, 468)  On December 18, 2007, Plaintiff went by wheelchair to
an orthopedic specialist, Dr. Barnard.  (R. at 463)  Plaintiff
complained of numbness, tingling and weakness in his legs which had
started a week ago.  (Id.)  Dr. Barnard diagnosed Plaintiff with
"apparent lumbar strain", (id.), and referred him to physical

---

[15] At his second hearing on January 29, 2009, Plaintiff testified
that his cane supported him when his legs were weak, (R. at 779), and
that his wife assisted him with his daily morning routine by helping him
walk to the bathroom, (R. at 782).  He said: "If I stand up in, in a spot
any longer than like 10 minutes the pain gets extremely worse, my legs
get, start to feel rubbery."  (R. at 774)  He continued: "They get like
a weak feeling like they it's, they seem to go, it's like numb like if
your arm falls asleep and then it starts, the blood starts to come back
and it starts tingling, that's how my legs feel."  (R. at 775)

therapy, (id.).[16]  On January 29, 2008, Dr. Barnard noted that
Plaintiff had a history of lower back pain and leg weakness.  (R.
at 470)

In sum, the three reasons on which the ALJ based his
credibility finding are not supported by substantial evidence.
Therefore, the matter should be remanded for further evaluation of
Plaintiff's credibility.  I so recommend.

### Summary

The Court finds that the ALJ's conclusion that Plaintiff was
no longer disabled as of June 28, 2005, is unsupported by
substantial evidence in the record.  In particular, the ALJ's
finding that medical improvement occurred as of that date is at
odds with the testimony of the ME and not supported by the other
medical evidence in the record.  The Court further finds that the
ALJ's credibility determination is not supported by substantial
evidence in the record.

### Conclusion

The Court finds that substantial evidence does not support the
ALJ's determination that Plaintiff was no longer disabled within
the meaning of the Act as of June 28, 2005.  I therefore recommend
that Plaintiff's Motion to Reverse be granted to the extent that

---

[16] Plaintiff testified at his hearing on March 11, 2008 that lately
he felt numbness in his legs for which he had received physical therapy
at the RIDOC.  (R. at 738)  This statement is supported by Dr. Barnard's
referral of Plaintiff to physical therapy to treat the numb, tingling,
and weak feeling in his legs.  (R. at 463)

the matter be remanded for further administrative proceedings and that Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
March 29, 2011